UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

Andrew Behlmann
Colleen M. Restel
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Email: abehlmann@lowenstein.com
Email: crestel@lowenstein.com

*Counsel to MLS Berkowitz Investments LLC*

| | |
|---|---|
| In re: | Case No.: 23-15334 (CMG) |
| | Chapter: 7 |
| MLS Berkowitz Investments LLC, | Hearing Date: August 3, 2023 |
| Alleged Debtor. | Judge: Honorable Christine M. Gravelle |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF MLS BERKOWITZ INVESTMENTS LLC FOR ENTRY OF AN ORDER DISMISSING INVOLUNTARY CHAPTER 7 PETITION AND AWARDING FEES, COSTS, AND DAMAGES**

MLS Berkowitz Investments LLC ("MLS"), the alleged debtor in the above-captioned involuntary chapter 7 bankruptcy case (the "Involuntary Case") filed by Gerald Metals Sarl ("Gerald"), hereby submits this motion (the "Motion") for entry of an order dismissing the Involuntary Case and awarding MLS a judgment against Gerald for fees, costs, and damages. In support of this Motion, MLS relies upon the *Declaration of Seth Berkowitz in Support of Motion of MLS Berkowitz Investments LLC for Entry of an Order Dismissing Involuntary Chapter 7 Petition and Awarding Fees, Costs, and Damages* (the "Berkowitz Decl.") filed simultaneously herewith and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      An involuntary chapter 7 bankruptcy petition is a drastic measure that should not be taken lightly.  It can cause serious disruption, expense, and embarrassment to an alleged debtor. It is entirely inappropriate where, as here, the alleged debtor has been unfailingly cooperative with the petitioning creditor.  This Involuntary Case must be dismissed because Gerald is ineligible to be a petitioning creditor and cannot demonstrate that MLS is not paying its undisputed debts as they come due.  Even if Gerald were eligible to be a petitioning creditor, the Involuntary Case should be dismissed because it was filed in bad faith.

2.      The Involuntary Case must be dismissed as not meeting the requirements of section 303 of the Bankruptcy Code because (a) Gerald (the only petitioning creditor) has an alleged claim that is the subject of a bona fide dispute, and therefore Gerald does not have standing to bring the Involuntary Case, and (b) Gerald has conceded that MLS has paid its undisputed debts as they have become due.  Accordingly, the Involuntary Case should be dismissed and MLS should be reimbursed for its fees, costs, and expenses in defending itself against the improperly filed Involuntary Case.

**JURISDICTION AND VENUE**

3.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief sought in this Motion are section 303 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1011 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**I.**    **The Parties and their Business Relationship**

5.    Gerald describes itself as "one of the oldest and the world's largest commodity trading company focused purely on the merchanting of non-ferrous, ferrous and precious metals, as well as related concentrates and raw materials" and "the leading market specialists in the trading of all forms of refined metals and raw materials around the world." *Who We Are*, Gerald Group, https://www.gerald.com/ (last visited July 13, 2023); *see also Certification in Support of Entry of an Order Appointing Interim Trustee Pursuant to 11 U.S.C. § 303(g) and F.R.B.P. 2001(a)* [Dkt. 5-1] (the "Lerner Cert."), ¶ 4.

6.    MLS is a small, specialized commodities trading firm based in New Jersey.  MLS was incorporated in 2016 and began doing business in 2019.  Gerald was MLS's only customer. After Gerald and MLS were defrauded in connection with the 2023 Shipments (defined below), MLS is not actively conducting business at this time.

7.    MLS and Gerald began doing business together in 2019, with MLS and/or its principal arranging sales of tin ingots from a third party to Gerald in exchange for a commission. In late 2021, Diego Possebon, a Brazilian national and an unaffiliated acquaintance of MLS's principal, offered to arrange sales of tin concentrate sourced in Brazil.  In November 2021, Gerald began purchasing bulk tin concentrate through MLS.

8.    Generally speaking, MLS purchased tin concentrate from miners in Brazil, sold the tin concentrate to Gerald, and paid a commission to Possebon.  Gerald purchased the tin concentrate on FOB origin terms, meaning legal title and all risk of loss passed to Gerald at the point of shipment.  Between November 2021 and January 2023, MLS sourced, sold, and arranged the shipment of approximately 735 metric tons of tin concentrate to Gerald for a total aggregate

sale price of approximately $23 million.  With limited exceptions involving a handful of containers stopped in transit by foreign customs authorities in late 2022, those transactions were successful and uneventful.

### A.    The January 2023 Contract

9.    The shipments that are the subject of the current dispute between MLS and Gerald occurred between February and May 2023, during which time more than 100 containers of tin concentrate were exported from Brazil to ports in Asia pursuant to a contract dated January 31, 2023, as amended thereafter (the "January 2023 Contract").[1]  The January 2023 Contract, which is on Gerald's letterhead, sets forth a number of specific terms and also attaches and incorporates by reference the *Gerald Group General Terms and Conditions of Purchase* (the "Terms and Conditions").

10.    The January 2023 Contract, like the prior agreements between MLS and Gerald, contains a force majeure clause (the "Force Majeure Clause") that provides as follows:

> **Neither party shall be liable to the other for any delay or failure in performing all or any part of its obligations under this Contract, to the extent that its performance has been prevented, prohibited, restricted, delayed or hindered due to a Force Majeure Event**. As used herein, a "Force Majeure Event" shall mean any event beyond the reasonable control of the affected party, whether foreseeable or not, including but not limited to strikes, lockouts, floods, Acts of God, nature, pandemic, disease outbreak (including but not limited to ebola), bad weather, fire, explosion, war (whether civil or otherwise or declared or undeclared), war-like operations, armed conflict, insurrection, embargo, riots, terrorism, civil commotion, slowdowns, other labour disputes, protests (whether peaceful or otherwise), **criminal acts**, hi-jacking, piracy, governmental action or interference (including but not limited to nationalization), appropriation or forced abandonment, any mine or loading equipment failure, breakdown or unavailability of transportation from any mine to the loading port(s), breakdown, stoppage or slowdown in production of the Material, compliance

---

[1]    A true and correct copy of the January 2023 Contract, including the Terms and Conditions, is annexed to the Berkowitz Decl. as **Exhibit A**.

with any order or instruction of any port, transportation, local or other authority (governmental or otherwise), court, legislation, regulation or directive having force of law. A Force Majeure Event shall not include any delay, hinderance, interference with, curtailment or prevention of the Seller's accrued obligation to make payment under the Contract whether in respect of price, dispatch, demurrage or any other financial obligation whatsoever. Economic hardship or a change in the market conditions shall not constitute a Force Majeure Event.

Terms and Conditions, ¶ 3.1 (emphasis added).

11.      Once one party declares a force majeure event, the Terms and Conditions permit the other party to cancel the remainder of the January 2023 Contract if the force majeure event persists for more than 90 days. *Id.* ¶ 3.3.  In the event of such cancelation, "any sum paid by Buyer to Seller for Material not delivered shall be repaid to Buyer by Seller and should Seller have delivered part of the Material pursuant to this Contract, for which Buyer have not yet paid, Buyer shall immediately pay Seller for the Material so delivered at the Contract price."  Terms and Conditions, ¶¶ 3.3, 3.4.

12.      Neither party disputes that criminal acts beyond the reasonable control of MLS (the fraudulent replacement of tin concentrate with sand) occurred.  However, as discussed below, it is unknown whether the fraud occurred before or after the containers were loaded on ships at the point of origin.  Because the material was sold FOB origin, it remains unresolved whether paragraph 3.4 of the Terms and Conditions would require MLS to repay any amounts to Gerald.

13.      The January 2023 Contract, as with the parties' prior agreements for sale of tin concentrate, provides for inspection and assay of the material at the origin and destination ports. The first such inspection (the "Provisional Analysis") calls for an agreed-upon assayer to inspect, sample, and assay the material, seal the containers, and oversee the weighing and loading process at a warehouse of Gerald's choice.  January 2023 Contract at 3.  Gerald has the right to attend any

sampling and analysis during the Provisional Analysis.  *Id.*  The January 2023 Contract requires
the material to be loaded on ships within 24 hours after the containers are sealed in the Provisional
Analysis.  *Id.*

**B.**    **The 2023 Shipments**

14.    The January 2023 Contract provided for Gerald to purchase 964 metric tons (later
increased by amendment) of tin concentrate "FOB Manaus, Brasil".  January 2023 Contract at 1
("Delivery Basis").   Each shipment (collectively, the "2023 Shipments") underwent and was
cleared through the Provisional Analysis and was then loaded and shipped, at which point title to
and all responsibility for the contents passed to Gerald pursuant to the specific terms of the January
2023 Contract.  A Gerald employee, Nicholas Servi, attended a sampling of one of the 2023
Shipments on April 5, 2023.  Mr. Servi witnessed tin and visited the warehouse where material
was loaded into containers.

**C.**    **The 2023 Payments**

15.    Pursuant to the January 2023 Contract, Gerald paid approximately $48 million to
MLS in respect of the 2023 Shipments.

16.    MLS then used those funds to pay (the "2023 Payments") certain third parties for
tin concentrate and related services, such as shipping, in the ordinary course of business.  The
largest recipient of the 2023 Payments was Florida-based Empire Strong International Business
Intermediation, LLC ("Empire Strong"), which received an aggregate amount of $23 million.
Empire Strong, in turn, was to use the funds to pay costs associated with sourcing certain of the
2023 Shipments.  The Florida Lawsuit (defined below), instituted by Empire Strong at Gerald's
direction, alleges that Empire Strong wired the funds to or for the benefit of four individuals and
one entity, none of which are affiliated with MLS or its principal in any way.

### D.    Discovery of Fraud

17.    As the 2023 Shipments began arriving at destination ports in Asia, a number of containers were determined to contain only sand, not tin concentrate.  Gerald's representatives inspecting the containers determined that the seals on the offending bags of material did not match the seals identified in the Provisional Analysis.  It remains unknown whether the offending material in the 2023 Shipments was initially delivered to the origin port or switched in transit after the Provisional Analysis.

18.    Although the parties agree that some wrongdoing occurred, there is an unanswered (critical) factual question of *when* the wrongdoing occurred and who is liable for the losses.

19.    Because (a) the material passed the Provisional Analysis—a process Gerald had the opportunity to participate in—and (b) the material was loaded on ships in Brazil pursuant to the January 2023 Contract, title and all risk of loss passed to Gerald at that time pursuant to the FOB origin terms of the January 2023 Contract.

20.    Gerald, however, contends that the fraud—of which MLS was a victim, alongside Gerald—was perpetrated prior to loading on the ship, and therefore MLS remains liable for the loss.

21.    As such, genuine issues of material fact (the timing and method of the fraud) and law (which party is liable) remain disputed and unresolved.  Because the material was sold FOB origin, these disputed, unresolved issues will be determinative of whether Gerald has a claim against MLS and, if it does, are relevant to a determination of the amount of that claim.  Until those issues are resolved, Gerald's alleged claim will remain the subject of bona fide disputes as to both liability and amount, and thus Gerald is ineligible to be a petitioning creditor.

### E.    MLS's Cooperation with Gerald

22.    Regardless of any accusations of fault, since learning of the fraud, MLS has been cooperating with Gerald and assisting in Gerald's efforts to recover the 2023 Payments.

23.    On May 18, 2023, at Gerald's insistence, MLS and its principal each executed an *Assignment of Rights and Credits* assigning to Gerald all of their rights and claims against third parties in respect of the 2023 Payments and a power of attorney granting Gerald the right to pursue such rights and claims both in the United States and abroad (together, the "Assignment").[2]

24.    Gerald and MLS jointly retained counsel to pursue claims against Empire Strong, but ultimately resolved the matter before filing suit.  Gerald, Empire Strong, and MLS entered into a *Settlement and Cooperation Agreement* (the "Cooperation Agreement"),[3] pursuant to which Empire Strong has agreed to cooperate with Gerald and help identify and recover funds from the subsequent transferees of the 2023 Payments.  In exchange, if Gerald is successful in recovering the approximately $22 million of 2023 Payments that Empire Strong transferred to third parties in connection with the 2023 Shipments, MLS (which has assigned its claims to Gerald) and Gerald will grant Empire Strong a release.

### F.    The Florida Lawsuit

25.    On July 5, 2023, pursuant to the Cooperation Agreement, Empire Strong filed a lawsuit (the "Florida Lawsuit")[4] against four individuals and one entity, none of which are affiliated with MLS in any way, seeking the return of more than $22,000,000 of 2023 Payments

---

[2]    A true and correct copy of the Assignment is annexed to the Berkowitz Decl. as **Exhibit B**.

[3]    A true and correct copy of the Cooperation Agreement is annexed to the Berkowitz Decl. as **Exhibit C**.

[4]    *Strong Empire International Business Intermediation, LLC v. Rodrigues et al.*, Case No. 2023-019146-CA-01 (Fla. Cir. Ct. 11th Cir. 2023).  For the Court's convenience, a true and correct copy of the complaint in the Florida Lawsuit (the "Florida Complaint") is annexed hereto as **Exhibit 1**.  MLS respectfully requests that the Court take judicial notice of the filing and allegations contained in the Florida Complaint pursuant to Federal Rule of Evidence 201.

sent to Empire Strong by MLS and, in turn, paid by Empire Strong to various third parties.  Upon information and belief, Gerald directed (and, pursuant to paragraph 4, funded) the preparation and filing of the Florida Lawsuit pursuant to the Cooperation Agreement.  The claims asserted in the Florida Lawsuit make clear that Diego Possebon, a Brazilian national who is not affiliated with MLS in any way, directed the payments by Empire Strong that are the subject of the Florida Lawsuit.

26.    Gerald's efforts to recover funds pursuant to the Assignment and the Cooperation Agreement are already bearing fruit.  On July 6, 2023, the court in the Florida Lawsuit entered an order granting Empire Strong's request for a preliminary injunction enjoining the defendants therein, and non-parties with knowledge of the order, from dissipating $2,750,000 of funds that Possebon fraudulently directed Empire Strong to wire to a title company, for the benefit of a third party, in furtherance of a real estate transaction unrelated to MLS or Gerald.[5]

## II.    The Involuntary Case

27.    On June 20, 2023, after being advised by counsel to MLS that Gerald's alleged claim was the subject of a bona fide dispute as to both liability and amount, Gerald filed the Involuntary Case.

28.    On June 28, 2023, Gerald filed the *Motion for Entry of an Order Appointing Interim Trustee Pursuant to 11 U.S.C. § 303(g) and F.R.B.P. 2001(a)* [Dkt. 5] (the "Interim Trustee Motion"),[6] together with a certification of Gary Lerner, an Executive Vice President and in-house lawyer at Gerald, in support thereof [Dkt. 5-1] and an *Application for Order Shortening Time* [Dkt. 6] (the "Application to Shorten Time") seeking an extremely expedited hearing on the Interim

---

[5]    For the Court's convenience, a true and correct copy of the Florida court's preliminary injunction order is annexed hereto as **Exhibit 2**.  MLS respectfully requests that the Court take judicial notice of the order pursuant to Federal Rule of Evidence 201.

[6]    Citations to the Interim Trustee Motion refer to the memorandum of law in support thereof [Dkt. 5-2].

Trustee Motion.

29.     On June 29, 2023, MLS filed a letter response in opposition to the Application to Shorten Time [Dkt. 7].

30.     On July 5, 2023, after MLS filed its letter response on June 29 and the Court held a conference with the parties on June 30, the Court entered an order denying the Application to Shorten Time [Dkt. 9].

31.     A hearing on the Interim Trustee Motion and this Motion is scheduled for August 3, 2023.  However, upon the filing of this Motion, the Interim Trustee Motion is now moot because the Court's decision on this Motion will result in either dismissal of the Involuntary Case or the appointment of a chapter 7 trustee.

### **RELIEF REQUESTED**

32.     By this Motion, MLS respectfully requests that the Court dismiss the Involuntary Case and award MLS a judgment against Gerald for costs, fees, and damages.

### **ARGUMENT**

**I.     THE INVOLUNTARY CASE MUST BE DISMISSED.**

33.     Before entering an order for relief in an involuntary bankruptcy case, the Court must first determine whether all the requirements for an involuntary petition have been satisfied. Among other things, (a) each petitioning creditor must be "a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount," 11 U.S.C. § 303(b)(1), and (b) the alleged debtor must be "generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount[.]"  11 U.S.C. § 303(h)(1).  Gerald cannot satisfy either of these criteria.

34.     In addition, both the filing of the Involuntary Case and Gerald's conduct since the filing demonstrate its bad-faith motive and intent in filing and proceeding with the Involuntary Case.  Thus, even if Gerald were eligible to be a petitioning creditor, the Involuntary Case nevertheless must be dismissed to avoid Gerald's abuse of the bankruptcy system.

## A.    The involuntary petition is moot.

35.     Gerald has stated that its goal in the Involuntary Case is for a trustee to "urgently launch what will likely be a global investigation to determine what happened here, who other than the Debtor was involved, and whether and to what extent the purchase price paid by Gerald can be traced and recovered thereby mitigating its substantial damages." Interim Trustee Motion at 6; *see* Lerner Cert., ¶ 3.  There is one glaring problem with that strategy:  At Gerald's demand, all of the claims and causes of action Gerald asserts it needs a trustee to pursue *have already been assigned to Gerald*, together with a power of attorney to pursue such claims.[7]  *See* Assignment.

36.     Gerald's witness in support of the Interim Trustee Motion breathlessly asserts that "[i]t is urgent to commence the tracing of funds and recovery as soon as possible.  Any delay may[ be] creating irrevocable harm in the ability to track and recover the payments." Lerner Cert., ¶ 22. What Gerald conveniently fails to note, though, is that *Gerald itself has already commenced such tracing and recovery* pursuant to the Assignment, power of attorney, and Cooperation Agreement. Prior to the commencement of the Involuntary Case, MLS's principal provided Gerald with volumes of information about MLS, the transactions giving rise to the foreign misappropriation of funds by third parties based in Brazil, and the parties involved, including facilitating joint conference calls with those parties—a level of voluntary cooperation far beyond even what Gerald might have sought to compel through formal discovery.  It is entirely unclear why Gerald opted to

---

[7]     MLS reserves all rights with respect to the Assignment and the accompanying power of attorney, including but not limited to the right to avoid the Assignment under applicable law.

commence the Involuntary Case, other than to put pressure on MLS and its principal to provide even more cooperation than they already have.

37.    Gerald is at the helm of the Florida Lawsuit pursuant to the Cooperation Agreement, and has been on the ground in Brazil investigating and seeking to commence litigation against multiple targets.  Gerald presently holds, in its own name as assignee, all the rights MLS and its principal previously had against the perpetrators of the fraud and their confederates. Pursuant to the Assignment and power of attorney, Gerald already has full discretion to investigate and pursue claims, both in the U.S. and abroad.  As a result, there would be nothing left for a trustee to do in the Involuntary Case.  The petition is moot and can be dismissed on that basis alone.

**B.    Gerald is not eligible to be a petitioning creditor.**

38.    A creditor whose claim is subject to a *bona fide* dispute as to liability or amount lacks standing to serve as a petitioning creditor.  11 U.S.C. § 303(b); *In re Tama Mfg. Co.*, 436 B.R. 763, 768 (Bankr. E.D. Pa. 2010); *see Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, 168 (2d Cir. 2010) (noting that an involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a legitimately disputed debt); *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117–18 (2d Cir. 2003).  Gerald's alleged claim against MLS is subject to multiple bona fide disputes as to both liability and amount.  As a result, Gerald does not have standing to be a petitioning creditor.

39.    Although the Bankruptcy Code does not define the term "bona fide dispute," courts use an objective standard, analyzing "whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt."  *In re Biogenetic Techs., Inc.*, 248 B.R. 852, 856–57 (Bankr. M.D. Fla. 1999) (citations omitted); *see BDC 56 LLC*, 330 F.3d at 117–18; *Tama Mfg.*,

436 B.R. at 768 ("Stated another way, a bona fide dispute exists and an involuntary petition must

be dismissed if substantial factual or legal questions exist regarding the putative debtor's liability

to the claimant.") (citations omitted).  Gerald's alleged claim against MLS is subject to bona fide

dispute on at least two grounds, making Gerald ineligible to be a petitioning creditor.  Accordingly,

the Involuntary Case must be dismissed.

       **i.**        **Dispute #1:  When did the fraud occur, and which party is responsible?**

40.      One glaring factual question remains unresolved: *Which party is legally responsible*

*for the Brazilian fraud?*  The answer depends, in part, on a second question:  *When did the fraud*

*actually occur?*  Whether Gerald has a claim against MLS at all, and if so, in what amount, depends

on the answers to these questions.  Both questions remain unanswered.

41.      The 2023 Shipments were sold FOB origin, a specific provision in the January 2023

Contract that placed all risk of loss on Gerald after the containers were loaded on ships.  *See, e.g.*,

*Fujian Zhangzhou Foreign Trade Co. v. World Imps., Ltd. (In re World Imports, Ltd.)*, 549 B.R.

820, 823 (E.D. Pa. 2016) ("Pursuant to the accepted terms of international trade, in a sale which

occurs free on board ('FOB') in the country of origin, the property is transferred to the buyer once

the goods are put on the ship."), *rev'd on other grounds*, 862 F.3d 338, 340 (3d Cir. 2017) (noting

that where goods were shipped FOB origin, "the risk of loss or damage passed to [the buyer] upon

transfer at the port").  Any claim by Gerald that MLS is responsible for the loss under the January

2023 Contract thus depends entirely on when the fraud occurred.

42.      There is no dispute that a third party perpetrated the fraud on both MLS and Gerald.

Gerald's own actions in demanding the Assignment, power of attorney, and Cooperation

Agreement and directing the filing of the Florida Lawsuit have demonstrated as much.  However,

a determination of *when* the fraud took place—that is, whether containers of sand were substituted

for tin concentrate before or after Gerald assumed the sole risk of loss under the FOB origin

provision of the January 2023 Contract—raises a genuine issue of material fact.  As part of that

determination, only one of the following two things can be true:

- the bags of material contained sand before being loaded on ships,

  or

- bags of tin concentrate were swapped for sand while in transit.

43.     If the fraud occurred in transit, Gerald is unequivocally out of luck because the

2023 Shipments were sold FOB origin and thus title and risk of loss passed to Gerald pursuant to

the specific terms of the January 2023 Contract once the containers were loaded on ships.

44.     On the other hand, if the fraud occurred prior to shipment, further factual inquiry

(and possibly interpretation of the January 2023 Contract) would be necessary to determine

whether responsibility for the resulting losses rests entirely with one party or is more properly

apportioned between the parties.  Because Gerald jointly selected the inspector for each of the

2023 Shipments and had the right to attend (and, on at least one occasion in April 2023, sent an

employee to attend) the Provisional Analysis for the 2023 Shipments, MLS believes that all or

substantially all responsibility would belong with Gerald.  Gerald has asserted the inverse.

45.     At this time, there is nothing in the record to demonstrate conclusively which of

these is true, creating a textbook issue of material fact.  As a result, Gerald's alleged claim remains

subject to bona fide dispute as to both liability and amount.

        **ii.**      **Dispute #2:  The Force Majeure Clause provides MLS with a defense
to Gerald's alleged claim.**

46.     Even if MLS were liable to Gerald, there is a further dispute as to whether the Force

Majeure Clause nevertheless would excuse MLS from liability.  The Force Majeure Clause

provides, in relevant part, that "*[n]either party shall be liable to the other* for any delay or failure

in performing all or any part of its obligations under this Contract, to the extent that its performance has been prevented, prohibited, restricted, delayed or hindered due to . . . criminal acts." Terms and Conditions, ¶ 3.1 (emphasis added).  The parties do not dispute that criminal acts by third parties outside the control of Gerald or MLS resulted in containers of sand, not tin concentrate, arriving at the destination ports.  MLS believes those criminal acts triggered the Force Majeure Clause and excuse MLS from liability.

47.    Gerald appears to believe paragraph 3.4 of the Terms and Conditions requires MLS to refund the 2023 Payments it received from Gerald.  However, because it remains unknown whether the containers contained sand or tin concentrate *at the time they were loaded onto ships at the origin port*, it remains to be determined which party bore the risk of loss at the time the fraud occurred.  That is a genuine issue of material fact, which renders Gerald's alleged claim subject to bona fide dispute as to both liability and amount and makes Gerald ineligible to be a petitioning creditor in the Involuntary Case.

> **iii.    Because Gerald's alleged claim is the subject of multiple, bona fide factual and legal disputes, Gerald is not eligible to be a petitioning creditor.**

48.    A determination of these two-party factual and legal disputes, and any other disputes regarding Gerald's alleged claim,[8] is not before this Court.  Rather, in evaluating whether Gerald has standing to be a petitioning creditor, the only issue before this Court is *whether a dispute exists* as to Gerald's alleged claim.  If so, the Court must dismiss the Involuntary Case. *Tama Mfg.*, 436 B.R. at 768; *see In re Frailey*, 144 B.R. 972, 976 (Bankr. W.D. Pa. 1992) (noting

---

[8]    MLS also has colorable arguments that (a) Gerald's demand for, and MLS's delivery of, the Assignment and the related power of attorney constituted an accord and satisfaction of any alleged claim Gerald may hold against MLS and (b) Gerald, by demanding the Assignment and power of attorney and thereafter investigating and pursuing claims against third parties, made an election of remedies with respect to its alleged claim and is therefore estopped from pursuing MLS any further.  These arguments form the bases of additional bona fide disputes with respect to Gerald's alleged claim.

that an involuntary petition must be dismissed "[i]f there is a genuine issue of material fact that bears upon the alleged debtor's liability or a meritorious contention as to the application of law to undisputed facts").

49.     Because Gerald's alleged claim is subject to multiple bona fide disputes as to both liability and amount, Gerald, the only petitioning creditor, lacks standing to act as a petitioning creditor.  As a result, the Involuntary Case must be dismissed.  11 U.S.C. § 303(b).

**C.     MLS is paying its undisputed debts as they come due.**

50.     An order for relief can only be entered in the Involuntary Case if MLS is generally not paying its debts as they become due—***other than those that are the subject of a bona fide dispute***.  11 U.S.C. § 303(h)(1).[9]  As discussed above, Gerald's alleged claim is the subject of multiple bona fide disputes as to both liability and amount.  Because Gerald is MLS's *only* alleged third-party creditor, Gerald has not demonstrated—as it cannot demonstrate—that MLS is not paying its undisputed debts as they come due.  In fact, the underlying dispute between Gerald and MLS stems from MLS's payment of its other creditors in the ordinary course of business.

51.     As a result, the requirements of section 303(h) of the Bankruptcy Code cannot be met, and the Involuntary Case must be dismissed.

**D.     Gerald filed the Involuntary Case in bad faith.**

52.     "A contested involuntary petition must be closely scrutinized because involuntary bankruptcy is an extreme measure that frequently carries serious consequences for the involuntary debtor, such as loss of credit standing, interference with business affairs, and even public

---

[9]     Alternatively, the Court may enter an order for relief if a custodian, other than a trustee, receiver, or agent was appointed or authorized to take charge of substantially all the alleged debtor's property within 120 days before filing the involuntary petition, which undisputedly did not occur here.  *See* 11 U.S.C. § 303(h)(2).

embarrassment." *Frailey*, 144 B.R. at 976 (citing *In re McDonald Trucking Co., Inc.*, 76 Bankr. 513, 516 (Bankr. W.D. Pa. 1987)).

53.     Even where one or more petitioning creditors have met all the requirements for filing an involuntary bankruptcy case, the case nevertheless may be dismissed if it was filed in bad faith.  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335–36 (3d Cir. 2015).  The Bankruptcy Code's requirement for good faith filings has "strong roots in equity," *id.* at 334 (citations omitted), and seeks to prevent improper involuntary petition filings by ensuring that the "balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy. . ." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004).

54.     Gerald filed the Involuntary Case solely as a leverage tactic in a two-party dispute. That is the epitome of bad faith and is antithetical to the collective nature of bankruptcy, and therefore the Involuntary Case should be dismissed even if Gerald could satisfy the criteria under section 303 of the Bankruptcy Code.

55.     The Third Circuit uses the highly fact-dependent "totality of the circumstances" test when evaluating whether an involuntary petition was filed in bad faith, evaluating a non-exhaustive list of factors, including whether:

> [1] the creditors satisfied the statutory criteria for filing the petition; [2] the involuntary petition was meritorious; [3] the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; [4] there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; [5] the filing was motivated by ill will or a desire to harass; [6] the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; [7] the filing was used as a tactical advantage in pending actions; [8] the filing was used as a substitute for customary debt-collection procedures; and [9] the filing had suspicious timing.

*In re Metrogate, LLC*, No. 15-12593 (KJC), 2016 Bankr. LEXIS 2242 at *39–40 (Bankr. D. Del.
May 26, 2016) (quoting *Forever Green*, 804 F.3d at 336).

56.     First, as set forth above, Gerald filed the Involuntary Case even though it knew
(a) MLS disputed its alleged claim and (b) Gerald could not demonstrate that MLS is failing to
pay its undisputed debts as they become due (in fact, Gerald's own certification has shown the
opposite to be true).  *See In re CNG Foods LLC*, No. 16-43278-nhl, 2020 Bankr. LEXIS 1842 at
*39–41 (Bankr. E.D.N.Y. July 13, 2020) ("Bad faith also exists where creditors file an involuntary
petition knowing their claims are in bona fide dispute.") (citations omitted); Lerner Cert., ¶ 19.

57.     Second, Gerald is the *only* third-party creditor of MLS and has conceded that its
only goal in the Involuntary Case is to collect its alleged debt from third parties, ***not to protect
creditors collectively***.  Gerald filed the Involuntary Case for tactical advantage and as a substitute
for customary debt-collection procedures outside of bankruptcy, nothing more.

58.     "A bankruptcy court should refuse to enter an order for relief where petitioning
creditors can go into state court to satisfy a debt."  *Frailey*, 144 B.R. at 977–78 (citation omitted).
Gerald, like the petitioning creditors in *Frailey,* has an adequate remedy in state law.  If Gerald
can prove liability against MLS, it could potentially obtain and execute a judgment against MLS.
*See id*. at 978.  Any subsequent transfers from MLS that would place MLS's property out of reach
of creditors could similarly be avoidable under state law without the need for a bankruptcy
proceeding.  *See id.* (noting that because there are adequate remedies at state law, there was no
prejudice in dismissing the involuntary petition).

59.     It is not clear what benefit Gerald would obtain by actually pursuing litigation, in
light of the Assignment, power of attorney, and Cooperation Agreement, but the fact remains that
the only appropriate path for Gerald to pursue its alleged claim should it wish to do so is litigation

in a non-bankruptcy forum.  For the same reasons, it is equally unclear what legitimate purpose
the Involuntary Case would serve.  Indeed, through the Cooperation Agreement, Gerald has
already reached a settlement with the largest recipient of the 2023 Payments from MLS, Empire
Strong, and has directed the commencement of the Florida Lawsuit, which resulted in the
preliminary freezing of $2,750,000 of funds traceable to the 2023 Payments.  Gerald should not
be permitted to abuse the bankruptcy process to engage in standard two-party collection activities
that are available to it, *and which it is already pursuing*, under non-bankruptcy law.

60.    Even more egregiously, Gerald concedes that it is not seeking to collect payment
from the estate but rather from third-party transferees.  Interim Trustee Motion at 6; Lerner Cert.,
¶¶ 3, 22.  That is, categorically, bad faith.  *Healthcare Real Est. Partners, LLC v. Summit
Healthcare REIT, Inc. (In re Healthcare Real Est. Partners, LLC)*, No. 15-11931 (CTG) 2023
Bankr. LEXIS 1262, at *4 (Bankr. D. Del. May 12, 2023) ("An involuntary bankruptcy case that
is filed *for any reason* other than the creditors' desire to maximize creditors' recoveries *against
the debtor's estate* cannot be in good faith.") (emphasis added).  Not only does Gerald not seek to
recover estate property, it also cannot credibly claim it is seeking pursuit of estate causes of action
*because it already owns them* pursuant to the Assignment.

61.    Finally, Gerald's conduct demonstrates its ill will and motive to harass MLS and
its principal.  Throughout the Involuntary Case, Gerald's conduct has remained entirely self-
serving.  In this regard, Gerald filed the Interim Trustee Motion and Application to Shorten Time
(a) based on facts it knows to be untrue and (b) without providing *any* notice or service of the filing
to MLS or its known counsel.  Gerald is clearly using this Involuntary Case as a litigation tactic to
threaten and coerce MLS and its principal.  Simply put, the Involuntary Case was filed in bad faith,
is being prosecuted in bad faith, is an abuse of the bankruptcy system, and should be dismissed.

## II.    MLS IS ENTITLED TO A JUDGMENT AGAINST GERALD FOR COSTS, FEES, AND DAMAGES.

62.    Section 303(i) of the Bankruptcy Code provides for costs, attorneys' fees, and damages to be awarded to an alleged debtor if the involuntary case is dismissed.

63.    For the reasons set forth above, the Involuntary Case was filed in bad faith. As a result, the Court may grant (a) damages proximately caused by filing the Involuntary Case and (b) punitive damages. 11 U.S.C. § 303(i)(2).

64.    Punitive damages are appropriate where, as here, the petitioning creditor filed the Involuntary Case as an improper bargaining tactic and "without regard to the requirements of the Bankruptcy Code." *CNG Foods*, 2020 Bankr. LEXIS 1842 at *61–64 (awarding $75,000 in punitive damages and noting proof of actual damages is not required).

65.    In *In re CNG Foods LLC*, the court's award of punitive damages also took into account that the involuntary petition included knowingly false statements, which misrepresentations could, in some instances, amount to criminal fines. *Id.* at *63–64 (noting that the official form of involuntary petition provides that making false statements in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both). Here, where Gerald's involuntary petition (a) is based on a singular claim that Gerald knows is the subject of a bona fide dispute and (b) affirmatively asserts that MLS is generally not paying its undisputed debts as they become due—a statement it knows and has admitted is false—punitive damages, at a minimum, are appropriate. *See id.* (holding petitioning creditors made false statements with respect to their claims which they knew were subject to a bona fide dispute).

66.    Even if the Involuntary Case is dismissed but the Court does not make a finding of bad faith, *i.e.* the Court finds Gerald is not eligible to be a petitioning creditor and/or the other requirements of section 303 have not been satisfied and stops there, MLS is nevertheless entitled

to a judgment against Gerald for costs and reasonable attorneys' fees and costs associated with defending against the Involuntary Case.  11 U.S.C. § 303(i)(1); *In re Navient Sols., LLC*, 627 B.R. 581, 588 (Bankr. S.D.N.Y. 2021) (noting "[t]here is a presumption that costs and attorneys' fees will be awarded to a putative debtor where an involuntary petition is dismissed.").

67.    As a result of the Involuntary Case and actions taken by Gerald in connection with the Involuntary Case, MLS has been forced to incur substantial attorneys' fees and costs in connection with both this Motion, a response to the Application to Shorten Time, potentially taking discovery in connection with and responding to the Interim Trustee Motion if Gerald refuses to withdraw it after the filing of this Motion, and responding to discovery propounded by Gerald in connection with the Interim Trustee Motion.

68.    Accordingly, for the reasons set forth herein, MLS requests entry of a judgment against Gerald awarding it damages in the form of costs, attorneys' fees, and damages (including putative damages).[10]

[ *signature page follows* ]

---

[10]    As costs and expenses are continuing to accrue in connection with the Involuntary Case and the Interim Trustee Motion, MLS requests permission to submit evidence by declaration regarding the total amount of damages it is entitled to at the conclusion of the hearing on the Motion.

## **CONCLUSION**

For the foregoing reasons, MLS respectfully requests that the Court dismiss the Involuntary

Case and grant MLS a judgment against Gerald for costs, fees, actual damages incurred in

connection with the Involuntary Case, and punitive damages.


Dated: July 17, 2023                                Respectfully submitted,

                                                    */s/ Andrew Behlmann*
                                                    Andrew Behlmann
                                                    Colleen M. Restel
                                                    Lowenstein Sandler LLP
                                                    One Lowenstein Drive
                                                    Roseland, NJ 07068
                                                    Email: abehlmann@lowenstein.com
                                                              crestel@lowenstein.com

                                                    *Counsel to MLS Berkowitz Investments LLC*